**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| Michael Cushman,<br><br>    Plaintiff,<br><br>v.<br><br>Union Pacific Railroad Co.,<br><br>    Defendant. | Case No. 8:23-cv-196<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Michael Cushman ("Cushman") files this Complaint against Defendant Union Pacific Railroad Co. ("Union Pacific" or "Defendant") for damages resulting from its violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, as amended ("ADA").

**PRELIMINARY STATEMENT**

1. Beginning in 2014, Union Pacific implemented company-wide changes to its fitness-for-duty program ("Fitness-for-Duty"). As a result of these changes, Union Pacific imposed a blanket requirement that employees in certain positions disclose specified health conditions—even when the condition had no impact on the employee's ability to safely perform his or her job. This requirement was needlessly invasive and violated the ADA by itself, but Union Pacific made matters worse by imposing a policy that automatically removes employees who disclose health conditions, or who Union Pacific suspects may have health conditions, from service. Union Pacific then subjects the employee to a Fitness-for-Duty evaluation, again regardless of whether the employee has been safely performing the essential functions of his or her job. These evaluations do not assess whether an employee is capable of performing the essential functions of his or her

position, and Union Pacific does not conduct physical examinations of employees. Furthermore, Union Pacific routinely disregards the opinions of outside doctors who do conduct physical evaluations of the employees. Instead, Union Pacific demands medical information from the employee and conducts a "file review," regularly and arbitrarily concluding that the employee is unfit for duty because of a disability, and issuing unnecessary work restrictions it then refuses to accommodate.

2. In February 2016, several Union Pacific employees commenced a class-action disability discrimination lawsuit against Union Pacific, alleging that Union Pacific's Fitness-for-Duty policies and practices constituted a pattern or practice of discrimination under the ADA. *See Quinton Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.). The District of Nebraska certified the class in February 2019; however, the Eighth Circuit Court of Appeals reversed the certification decision in March 2020.

3. Cushman is a victim of the same discriminatory Fitness-for-Duty policies and practices alleged in *Harris*. Despite being qualified and safely performing his job without incident, Cushman was removed from service for a Fitness-for-Duty evaluation under the new program and excluded from work at Union Pacific because of a disability. Cushman was a class member in *Harris*, and now timely brings this individual legal action.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. § 1331 because Union Pacific violated the ADA.

5. Venue is proper under 28 U.S.C. § 1391(b)(1), because defendant is headquartered in Omaha, Nebraska.

6. Venue is proper under 42 U.S.C. § 2000e-5(f)(3) because unlawful employment practices were committed by Union Pacific in Omaha, Nebraska, because employment records relevant to defendant's unlawful employment practices are maintained and administered in Omaha, Nebraska, and because Union Pacific's principal office is in Omaha, Nebraska.

## THE PARTIES

7. Cushman resides in San Antonio, Texas. He was an employee of Union Pacific working out of San Antonio, Texas.

8. Union Pacific is a railroad carrier engaged in interstate commerce and has operations in San Antonio, Texas and is headquartered in Omaha, Nebraska.

## FACTUAL ALLEGATIONS

### *UNION PACIFIC'S FITNESS-FOR-DUTY POLICIES AND PRACTICES*

9. Union Pacific's Medical Rules, as reviewed and revised on February 1, 2014 (attached as Exhibit A), apply to all Union Pacific employees across the country. They outline the Fitness-for-Duty program at Union Pacific.

10. The Medical Rules require, among other things, that all employees in Telecom positions, Supply Department field positions, Operating Department field positions (including Transportation, Engineering Services and Mechanical positions), and Dispatcher positions disclose "any new diagnosis, recent events, and/or change in the following conditions"—which Union Pacific labels "Reportable Health Events." (Exhibit A). This includes, but is not limited to, loss of consciousness no matter the duration.

11. Union Pacific's Fitness-for-Duty and "Reportable Health Events" policies are even broader in practice than the Medical Rules reflect. Union Pacific routinely triggers

3

the Fitness-for-Duty process for employees who have never indicated they are unable to perform the essential functions of their jobs, simply because Union Pacific learns or suspects that the employee has, or has had in the past, a listed or non-listed health condition, or because a manager refers the employee to Health and Medical Services based on a belief that an employee may have such a health condition.

12. Union Pacific also maintains other unlawful policies and qualification standards related to Fitness-for Duty that are not included within the Medical Rules. For example, Union Pacific uses a "1% rule" that disqualifies from service any employee who Union Pacific suspects or believes may be at more than a 1% risk of sudden incapacitation. Union Pacific also requires employees to undergo exercise tolerance testing and then disqualifies from service any employee whose test results are not "normal," based on an indication that the employee may have a cardiac condition, however minor. On information and belief, Union Pacific maintains other, similar policies that it uses to screen out employees with disabilities for failing to meet a discriminatory qualification standard.

13. When a Fitness-for-Duty evaluation is triggered, the employee must:

**Stay off work** (not to report to work or mark up for work) until Health and Medical Services has completed a Fitness-for-Duty evaluation for that particular health event and has provided the employee's Supervisor with notification that the employee is fit for duty and able to return to his/her job.

**Notify his/her Supervisor** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty determination prior to the employee being able to work.

**Notify Health and Medical Services** that he/she has had a Reportable Health Event that requires Health and Medical Services to complete a Fitness-for-Duty evaluation.

(Exhibit A.)

14. These Fitness-for-Duty evaluations are not individualized assessments of

4

the employee's ability to safely perform the essential functions of the employee's job.

15. Union Pacific does not directly examine employees during Fitness-For-Duty evaluations.

16. Union Pacific routinely disregards the opinions of the employee's treating medical provider(s) and other medical providers who have physically examined the employee and instead makes broad requests for medical information, including medical records, from the employee.

17. Once Union Pacific receives the medical information, Union Pacific's Health and Medical Services Department, located in Omaha, Nebraska, conducts a "file review" and issues a Fitness-for-Duty determination that the employee is either fit for duty, fit for duty with restrictions, or unfit for duty.

18. Union Pacific's Health and Medical Services Department routinely issues Fitness-for-Duty determinations that disqualify employees from their positions because of a disability, even though the disability does not affect the employee's ability to safely perform the essential functions of the employee's job (or other positions for which the employee may also be qualified).

19. The Health and Medical Services Department also uses discriminatory qualification standards, tests, and/or other criteria to exclude individuals with disabilities from their positions.

20. When issuing Fitness-for-Duty determinations, the Health and Medical Services department relies on standardized protocols for employees with certain broad categories of health conditions or treatments, and assigns standardized work restrictions to employees.

21. For example, as part of these standardized protocols, the Health and Medical Services Department regularly relied on the Federal Motor Carrier Safety Administration ("FMCSA") 2014 Medical Examiner's Handbook ("The 2014 Medical Examiner's Handbook"), which the company downloaded from the FMCSA website, to determine which health conditions required work restrictions, which standard restrictions to impose, and how long those restrictions should remain in place.

22. Union Pacific's Chief Medical Officer Dr. Holland described the 2014 Medical Examiner's Handbook as "one of the sources we think is the best."

23. The recommendations contained in the 2014 Medical Examiner's Handbook, however, did not apply to railroad workers, but instead provided non-binding guidance to FMCSA medical examiners for use in medical certification of drivers operating a commercial vehicle in interstate commerce.

24. In addition, by December 2014, the FMCSA withdrew the 2014 Medical Examiner's Handbook from its website and no longer endorsed it for use for commercial driver certifications. Upon information and belief, the 2014 Medical Examiner Handbook was never reindorsed by the FMCSA once it was removed from the website.

25. By at least 2015, Dr. Holland and Union Pacific learned that the FMCSA removed the Handbook from its website, and it was no longer endorsed for use.

26. Despite this, Union Pacific continued to rely on the outdated Handbook as a basis to assign standardized work restrictions for its employees, including workers who are not subject to FMCSA medical certification requirements.

27. Union Pacific also represented to Courts that the 2014 Medical Examiner Handbook was reliable guidance and supported its decisions to impose standardized work

restrictions for its employees:

    a. "Union Pacific concluded that the 1% level of acceptable risk for sudden incapacitation is consistent with the acceptable risk threshold recommended by the FMCSA Medical Review Board and the 2014 version of the online FMCSA Medical Examiner Handbook[.]" Def.'s Br. in Opp'n to Pl.'s Mot. for Class Certification at 21, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 259 (internal quotations omitted).

    b. "In 2014 the FMCSA issued Medical Examiner Handbook (FMCSA 2014) to provide medical examiners guidance for making medical fitness-for-duty recommendations for multiple health conditions that can impair the safety for commercial vehicle drivers. These and other recent FMCSA guidance documents, have served [] as reference materials and a general model for developing the Medical Fitness-for-duty Guidelines presented here." Dr. Holland Rebuttal Expert Report, May 11, 2018, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 249-16.

    c. "Since 2014, Union Pacific has relied on the FMCSA's guidelines, as reflected in its Medical Examiner Handbook, in determining whether employees with epilepsy, a single unprovoked seizure, or other seizure risks who work in safety sensitive positions have an unacceptably high seizure risk such that it is appropriate to impose work restrictions." Decl. of Dr. John Holland dated Oct. 2, 2018 at 6, *Harris et al. v. Union Pacific Railroad Co.*, 8:16-cv-00381-JFB-SMB, ECF No. 261-71.

    d. "[E]mployers may rely on their own physicians and FMCSA guidelines to make this sort of reasonable, safety-based medical judgment about an employee who drives commercial vehicles." Def.'s Br. in Supp. of Mot. for Summ. J. at 2, *Miller v. Union Pacific Railroad Co.*, 8:20-cv-00311-JFB-SMB, ECF No. 380.

28. Through its Fitness-For-Duty program, Union Pacific removes employees from service based on medical conditions it learns or believes an employee may have or may have had in the past, whether or not such conditions actually interfere with the employee's ability to perform the essential functions of their position, and without making a good-faith effort to determine whether a reasonable accommodation exists.

29. As a result of the conduct described above, Union Pacific employees who have never had a problem performing the essential functions of their jobs have been forced to

disclose sensitive medical information, stay off work without pay, and many have lost their livelihoods.

### *PLAINTIFF MICHAEL CUSHMAN*

30. Cushman was hired by Union Pacific on February 9, 1999, as a trainman, then promoted to a switchman, and then a conductor up until September 2004.

31. Most recently, starting in September 2004, Cushman worked for Union Pacific as a locomotive engineer based out of San Antonio, Texas. He worked ably in and around trains for over sixteen years without incident.

32. On August 3, 2015, Cushman lost consciousness while at work in his parked train engine in Laredo, Texas. Before losing consciousness, he felt nauseated for several minutes and broke into a cold, clammy sweat, so he opened a window.

33. After losing consciousness, Cushman was seen in a hospital and diagnosed with syncope.

34. Because Cushman lost consciousness while at work, Union Pacific immediately removed him from work without pay. While held out of work, he sought treatment from medical specialists regarding this loss of consciousness incident.

35. By November 2015, Cushman's medical specialists and physician cleared him to return to work with no restrictions. His treating neurologist, Dr. Ladislau Albert, Jr., and cardiologist, Dr. Meeney Dhir, cleared him to return to work on October 7, 2015 and October 26, 2015, respectively. Cushman's treating physician, Dr. David Sandercock, cleared him to return to work with no restrictions on November 4, 2015.

36. Despite these clearances, in a "Fitness-for-Duty Determination" memorandum dated December 16, 2015, Union Pacific's Chief Medical Officer, Dr.

Holland, stated that Cushman "requires permanent work restrictions for sudden incapacitation risks."

37. Dr. Holland based this decision, at least in part, on a determination from Dr. Reed Wilson, a neurology consultant for the company, who reviewed Cushman's medical records, including his clearances to return to work, and labeled Cushman as having a "moderate to high" risk of sudden incapacitation.

38. The permanent restrictions listed in the December 16, 2015 memorandum were as follows: (1) Not to operate company vehicles/on-track or mobile equipment/fork-lifts; (2) Not to work on or near moving trains, freight cars, or locomotives, unless protected by barriers; (3) Not to operate cranes, hoists, or machinery, if these activities might create a risk of harm to others or a risk of catastrophic injury to the employee; (4) Not to work at unprotected heights, over 4 feet above the ground; (5) If a new job assignment is considered, then HMS should review the functional job demands to determine if he can safely perform the essential functions of the job.

39. Dr. Holland further stated in the December 16, 2015 memorandum that Cushman's restrictions were consistent with recommendations from the FMCSA.

40. At no time during Union Pacific's Fitness-for-Duty Determination process, or after, did Dr. Holland, Dr. Wilson, or any other doctor affiliated with Union Pacific physically examine Cushman.

41. In a letter dated December 21, 2015, and signed by Terry Owens, Director of Disability Management, Union Pacific further informed Cushman that his "supervising department has been unable to identify a reasonable accommodation" and enclosed a document entitled, "What are my options now that I am unable to return to my railroad

9

job?"

42. After Cushman was informed of his permanent work restrictions, he sought an accommodation to work in other positions at Union Pacific that would fit within his restrictions. He applied for over a dozen jobs at Union Pacific and was interviewed multiple times. However, he did not receive any job offers at Union Pacific and so he went to work elsewhere as an Operator for Freedom Terminal Services, making substantially less than what he earned as a locomotive engineer at Union Pacific.

43. After nearly four years, Union Pacific finally allowed Cushman to return to work as a locomotive engineer on May 15, 2019. This was after Cushman inquired about returning to work and submitted further medical records.

44. Since the 2015 incident, Cushman remained capable of working as a locomotive engineer with Union Pacific.

45. On February 19, 2016, counsel for Cushman, on behalf of six named plaintiffs and those similarly situated, filed a First Amended Complaint against Union Pacific in the Western District of Washington, alleging disability discrimination in violation of the ADA, along with state law. The case was thereafter transferred to the District of Nebraska. *See Harris et al. v. Union Pacific Railroad Company*, Case No. 8:16-cv-381 (D. Neb.).

46. Because he was a class member in the *Harris* case, Cushman's disability discrimination claims have been subject to tolling during the pendency of litigating the class-wide claims, pursuant to the Supreme Court's ruling in *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345 (1983).

47. This Court certified the class action in February 2019; however, the Eighth

Circuit Court of Appeals reversed the certification decision on March 24, 2020.

48. As a result of *Crown Cork* tolling, Cushman had three hundred (300) days from the date of the Eighth Circuit's order to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Shortly after the Eighth Circuit issued its order reversing class certification, the parties entered into a tolling agreement, extending the statute of limitations for Cushman's and other class members' claims by an additional sixty (60) days. Cushman timely filed a charge of discrimination with the EEOC on April 10, 2020. On May 9, 2023, the EEOC issued a right-to-sue letter. Cushman now timely initiates the present lawsuit.

## CAUSES OF ACTION

## COUNT I

### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(a) DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

49. Cushman incorporates the foregoing paragraphs by reference.

50. The ADA defines a disability as (A) a physical or mental impairment that impairs one or more major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1).

51. At all relevant times, Cushman was an individual with a disability as defined by the ADA.

52. At all relevant times, Cushman had the requisite skill, experience, education, and other job-related requirements of his position, could perform the essential functions of his position with or without reasonable accommodations, and was therefore a qualified individual under the ADA.

53. At all relevant times, Cushman could perform the essential functions of his

position, with or without reasonable accommodations.

54. Section 12112(a) of the ADA prohibits employers from discriminating against qualified individuals on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

55. Union Pacific discriminated against Cushman on the basis of disability by, among other things, removing him from service for years because of a disability.

56. Because Union Pacific violated 42 U.S.C. § 12112, Cushman has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Cushman is also entitled to attorneys' fees and costs incurred in connection with these claims.

57. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Cushman and others similarly situated. As a result, Cushman is entitled to punitive damages.

## COUNT II

### *VIOLATIONS OF THE ADA, 42 U.S.C. § 12112(b)(6)*
### *DISABILITY DISCRIMINATION—DISPARATE TREATMENT*

58. Cushman incorporates the foregoing paragraphs by reference.

59. " '[D]iscriminat[ing] against a qualified individual on the basis of disability' includes…using qualification standards, employment tests or other selection criteria that screen out . . . an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6).

12

60. Union Pacific discriminated against Cushman on the basis of disability by using facially discriminatory qualification standards, employment tests, and/or other selection criteria, as part of its Fitness-For-Duty program and related policies, that are intended to screen out individuals with disabilities, and which did screen out Cushman.

61. Union Pacific's qualification standards are neither job-related nor consistent with business necessity.

62. Because Union Pacific violated 42 U.S.C. § 12112, Cushman has suffered and will continue to suffer loss of income, emotional distress, and other damages in an amount in excess of $75,000. Cushman is also entitled to attorneys' fees and costs incurred in connection with these claims.

63. Union Pacific committed the above-alleged acts with reckless or deliberate disregard for the rights and safety of Cushman and others similarly situated. As a result, Cushman is entitled to punitive damages.

**PRAYER FOR RELIEF**

**WHEREFORE, Cushman prays for judgment against Union Pacific as follows:**

1. That the practices of Union Pacific complained of herein be determined and adjudged to constitute violations of the ADA;

2. An injunction against Union Pacific and its directors, officers, owners, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

3. For an award of damages arising from loss of past and future income, emotional

   distress, and other compensatory damages in excess of $75,000.00;

4.  Pre-judgment interest, as provided by law;

5.  For Cushman's costs, disbursements and attorneys' fees pursuant to law;

6.  For an award of punitive damages;

7.  For all relief available under the ADA;

8.  For such other and further relief available by statute; and

9.  For such other and further relief as the Court deems just and equitable.

Date: May 15, 2023           **NICHOLS KASTER, PLLP**

                  s/*Laura A. Baures*
                  James H. Kaster* (MN # 53946)
                    kaster@nka.com
                  Lucas J. Kaster* (MN # 396251)
                    lkaster@nka.com
                  Laura A. Baures* (MN# 392081)
                    lbaures@nka.com
                  80 South Eighth Street
                  4700 IDS Center
                  Minneapolis, Minnesota 55402-2242
                  Telephone: (612) 256-3200
                  Fax: (612) 338-4878

                  *Admitted in D. Neb.

                  **ATTORNEYS FOR PLAINTIFF**